IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

GINGER HOOPER and          *
LARRY MARSHALL,
                           *
    Plaintiffs,
                           *
vs.                                  CASE NO. 4:08-CV-159 (CDL)
                           *
TOTAL SYSTEM SERVICES, INC.,
                           *
    Defendant.
                           *

O R D E R

Plaintiffs Ginger Hooper and Larry Marshall are former employees of Defendant Total System Services, Inc. ("TSYS"). Hooper claims that TSYS discriminated against her because of her gender. Specifically, she maintains that she was paid less than similarly situated male employees, that she was fired because of her gender, and that TSYS retaliated against her when she complained about gender discrimination. Marshall contends that TSYS discriminated against him because of his race. Specifically, he maintains that he was paid less than similarly situated white employees, that he was denied promotional opportunities because of his race, and that he was terminated due to his race and in retaliation for complaining about unlawful discrimination. In addition to comparator evidence which Plaintiffs argue supports their disparate treatment claims, Plaintiffs also rely on the expert testimony of Michael

Daniels, Ph.D. who opines that a statistical analysis of TSYS employment data supports Plaintiffs' disparate treatment claims.

TSYS denies Plaintiffs' claims. TSYS argues that Plaintiffs have failed to identify similarly situated comparators to support their disparate treatment claims, that no evidence exists that Plaintiffs were paid less due to their race or gender, and that the undisputed evidence establishes that it terminated Plaintiffs for legitimate non-discriminatory reasons. TSYS also seeks to exclude Daniels's testimony because it is not probative of any of the issues in the case.

For the reasons set forth below, TSYS's Motion to Strike the Testimony of Daniels (ECF No. 88) is granted, and TSYS's Motion for Summary Judgment (ECF No. 54) is granted in part and denied in part. The Court denies summary judgment as to Hooper's Equal Pay Act and Title VII wage discrimination claims but grants summary judgment as to all of Hooper's other claims. The Court denies summary judgment as to Marshall's discriminatory discharge claims but grants summary judgment as to all of Marshall's other claims.

## MOTION TO STRIKE

Plaintiffs make a sweeping allegation that women and black employees in the TSYS Output Services Group were discriminated against based on their race and gender. The Output Services Group consisted of three divisions—Card Services, Statement

Services, and Specialty Services—and was managed by Plaintiffs'
ultimate boss, Group Executive Rick St. John during the relevant
time period. Plaintiffs rely on the testimony of Michael
Daniels, Ph.D. to support their contention that a statistical
analysis of TSYS's employment data establishes that, within
Output Services, women and black employees received smaller
percentage salary increases than white males and that black male
employees were terminated at a higher rate than white male
employees. TSYS contends that Daniels's opinion is not probative
of any issues in the case and asks the Court to strike his
testimony.

The Court finds that Daniels is qualified to perform the
statistical analysis that he performed and that some of his
precise opinions are reliably supported by his analysis. The
Court also finds, however, that his opinions and analysis do not
support the position advanced by Plaintiffs. Daniels's analysis
is not probative or reliable on the issue of whether TSYS
engaged in disparate treatment of black and female employees
based upon their race and gender. Quite simply, his analysis
failed to take into consideration the essential factors used by
TSYS in its employment policies to determine compensation,
advancement, and termination. Therefore, Daniels's opinions do
not reliably support the allegations for which Plaintiffs
proffer them.

It is undisputed that Daniels assumed that pay increases should have been roughly the same percentage for all employees, regardless of the employee's division, job responsibilities, or any other factor. The TSYS Compensation Guide, however, states that TSYS considers the following factors in making salary adjustments: performance, job responsibilities, salary history, salary budget, and measures specific to the division or job function. Def.'s Ex. D-1 to *Daubert* Hr'g, TSYS Compensation Guide 19, ECF No. 114 [hereinafter TSYS Comp. Guide]; *accord* Pls.' Ex. P-1 to *Daubert* Hr'g, TSYS 2008 Team Member Guide 24 § 2.7, ECF No. 113 [hereinafter 2008 Team Member Guide] (stating that TSYS's compensation program measures individual performance and recognizes "that jobs vary in degree of complexity, difficulty, scope, and impact on business results" and that "individual team members achieve different levels of performance"). Daniels did not consider any of these other factors in his analysis. Therefore, the Court concludes that his report is not probative on the issue of whether TSYS discriminated against Plaintiffs with regard to their compensation.[1]

_____

[1] In response to the Court's questions during the *Daubert* hearing regarding whether Daniels should have considered factors like division and grade in his analysis, Daniels "reformatted" his report. The Court finds that the "reformatted" report is still not probative on the issues in this case.

First, Daniels "reformatted" his report to compare compensation by division, and he concluded that there was no statistically significant difference in compensation between Card Services and

It is also undisputed that Daniels assumed that the distribution of terminations for each group of employees would mirror the population as a whole. In other words, Daniels assumed that the percentage of black male employees who were terminated by TSYS would be roughly the same as the percentage of black male employees in the overall TSYS work force. It is undisputed that Daniels did not consider other factors that would affect an employee's likelihood of termination, such as division, job function, and job level. Therefore, the Court concludes that Daniels's report is not probative on the issue of whether TSYS discriminated against Marshall in terminating him.

For these reasons, TSYS's Motion to Strike (ECF No. 88) is granted, and the Court will not consider Daniels's reports or testimony in ruling on TSYS's summary judgment motion.

---

Statement Services. Pls.' Supplemental Br. Ex. 2, Daniels Aff. ¶ 8, ECF No. 128-2. He also compared one type of compensation—developmental increases—across grade but did not compare other types of compensation. *Id.* In his "reformatted" report, Daniels still did not compare compensation by grade *and* division, he did not consider all types of compensation by grade, and he did not consider any other factors.

Second, in his prior reports, Daniels analyzed compensation by year; in some years, he found statistically significant differences, and in other years he did not. In response to the Court's questions during the *Daubert* hearing regarding the probative value of this analysis, Daniels "reformatted" his report to aggregate the data across all years. *Id.* ¶¶ 11-12. He did not "reformat" the report to consider any of the TSYS compensation factors, including salary budget, which varies from year to year.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## DISCUSSION

The Court begins its discussion with the facts common to both Plaintiffs. It then addresses the claims of each Plaintiff separately, focusing on the facts that are relevant to an analysis of each Plaintiff's claims. The Court views the record in the light most favorable to Plaintiffs.[2]

---

[2] In opposition to summary judgment, Plaintiffs submitted Hooper's second affidavit to the Court on May 18, 2011—three months after their summary judgment response and a month-and-a-half after their surreply brief and their response to TSYS's motion to strike Daniels's testimony. The affidavit was attached to a supplemental brief that was supposed to address the narrow issues raised in the *Daubert* hearing, namely whether Plaintiffs' expert had considered all of the pertinent variables in conducting his analysis.

Hooper's second affidavit contains some speculation by Hooper as to whether her superiors considered the TSYS compensation guidelines,

## I. Common Facts

### A.   TSYS's Output Services Division

As part of its business, TSYS produces private-label credit cards for its clients.  Def.'s Mot. for Summ. J. Attach. 17, Walker Aff. ¶ 3, ECF No. 54-17.  Hooper and Marshall worked in the Card Services division, which is responsible for producing those private-label credit cards.  *Id.* ¶¶ 10-11.  The Card Services division is part of a group called Output Services. During the relevant timeframe, Output Services was comprised of three divisions: Card Services, Statement Services, and Specialty Services.  *Id.* ¶ 10.  The Card Services division stores blank plastic credit cards in a secure vault, personalizes the blank cards for TSYS clients, and mails the cards to clients or card holders.  *Id.* ¶ 11.  Statement Services generates, prints, and mails credit card statements on behalf of TSYS clients.  *Id.* ¶ 12.  During the relevant timeframe, Specialty Services, which has now been eliminated, handled specialty mail design, production, and mailing.  *Id.* ¶ 13.

---

but Hooper did not have personal knowledge of what her superiors considered.  *E.g.,* Pls.' Supplemental Br. Ex. 1, Hooper Aff. ¶ 6, ECF No. 128-1 [hereinafter Hooper Aff. II] ("I never heard that employees in higher grade levels were given higher percentage merit or developmental increases because they were in these higher grade levels.").  The rest of the affidavit addresses matters that were at issue when Plaintiffs filed their summary judgment opposition and when Plaintiffs responded to TSYS's motion to strike.  The Court considers the affidavit to be an untimely summary judgment response and declines to consider it in ruling on TSYS's summary judgment motion.

During the relevant timeframe, Rick St. John, a white male, was the group executive responsible for Output Services. *Id.* ¶ 14; *accord* St. John Dep. 7:4-12, ECF No. 101. St. John reports to Colleen Kynard, a white female who is the executive vice president of customer care. Walker Aff. ¶ 14; *accord* St. John Dep. 8:16-19. Plaintiffs' central theory of the case is that St. John wanted the leadership of Output Services to be all white males and that he engineered Plaintiffs' terminations to bring about this vision. TSYS asserts that Kynard was the decisionmaker with regard to certain decisions, but Plaintiffs contend that St. John was the real decisionmaker. The Court is satisfied that there is sufficient evidence to create a genuine fact dispute that St. John made the employment decisions in this case and that Kynard merely ratified them; the undisputed evidence shows that St. John recommended or signed off on each of the employment decisions at issue in this action. The remaining question is whether there is a genuine fact dispute as to whether St. John's decisions were motivated by Hooper's gender and Marshall's race.

B.   The Card Services Division

In the Card Services division, there are several areas of responsibility, including the card vault and the card production areas. *E.g.*, Walker Aff. ¶¶ 17-19; Def.'s Mot. for Summ. J.

Attach. 15, St. John Aff. ¶¶ 5-7, ECF No. 54-15.[3]  TSYS asserts
that Plaintiffs were ultimately terminated because of serious
mistakes that were made under their supervision.  Plaintiffs do
not dispute that they were responsible for the card vault, among
other things.  The card vault employees are responsible for the
pre-production phase of the production process; they receive and
securely store blank plastic credit cards ("plastics"), account
for the plastics inventory, sometimes apply graphic images to
the plastics, and pull blank plastics from the vault and send
them to other areas based on customer requests.  *E.g.*, Walker
Aff. ¶ 17; St. John Aff. ¶ 5; Pls.' Resp. to Def.'s Mot. for
Summ. J. [hereinafter Pls.' Resp.] Ex. 1, Hooper Aff. ¶ 51, ECF
No. 61-1 [hereinafter Hooper Aff. I] (stating that card vault
employees are responsible for "pulling, verifying, and balancing
each card order").

When a TSYS client orders private-label credit cards, the
card vault employees pull the blank plastic cards from the card

---

[3] Plaintiffs argue that the Court should not consider the testimony of
Rick St. John and Tracy Walker regarding the structure and functions
of Output Services because "they did not know the details about how
the production process worked."  Pls.' Resp. to Def.'s Statement of
Alleged Undisputed Material Facts 6, ECF No. 67 [hereinafter Pls.'
SMF].  Similarly, Plaintiffs contend that the Court should disregard
the affidavit of Colleen Kynard because Kynard "had no knowledge of
any facts" related to Plaintiffs' jobs or termination.  *Id.* at 24.
Kynard was the executive vice president of customer care, and she was
involved in the investigation of the error that TSYS contends was the
basis for Hooper's termination.  St. John was the group executive for
Output Services.  Walker was a director in TSYS's human resources
department, and she provided support to Output Services.  The Court is
satisfied that these individuals have sufficient knowledge to provide
the high-level overview that they provided in their affidavits and
depositions.

vault and send them to the production area. In the production area, the cards are personalized with characters, colors, graphics, holograms, and magnetic stripes. Def.'s Reply in Supp. of Summ. J. Attach. 3, Davis Aff. ¶ 10, ECF No. 86-3. Then, mailers are printed, and the personalized cards are attached to mailers and inserted into envelopes, along with any inserts. Walker Aff. ¶ 19; St. John Aff. ¶ 7.

C.   TSYS Job Titles

Since Plaintiffs rely upon job titles in support of their comparator analysis, it is necessary to understand the TSYS job title nomenclature. TSYS uses the same general job titles across its business units and departments. Walker Aff. ¶ 5. Under this system, team leads report to managers, managers report to associate directors, associate directors report to directors, and directors report to senior directors. *Id.*[4] TSYS also uses the same basic job descriptions across its business units. *Id.* ¶ 6; *see also, e.g.,* Pls.' Resp. Ex. 3 at HOOPER/MARSHALL000136, Job Summary for Director, Production, ECF

---

[4] Plaintiffs appear to suggest that the Court should disregard the portions of Walker's affidavit regarding TSYS job titles and compensation. First, Plaintiffs argue that Walker did not establish a foundation for her affidavit statements regarding TSYS's job titles and compensation. Pls.' SMF 2. Second, Plaintiffs contend that Walker's statements are unsupported legal conclusions. *Id.* Walker stated in her affidavit that she is employed as "Director, Human Resources" for TSYS. Walker Aff. ¶ 1. She also stated that in preparing the affidavit, she "relied upon [her] personal knowledge and information obtained through review of documents and other information kept and maintained in the regular course of business." *Id.* ¶ 2. The Court is satisfied that Walker's affidavit has sufficient foundation, and the Court finds it appropriate to rely on the facts set forth in the affidavit.

No. 61-3 (statements in job summaries "are intended to describe the general nature and level of work being performed by employees, and are not to be construed as an exhaustive list of responsibilities, duties, and skills required of personnel so classified").

## II. Ginger Hooper's Claims

### A. Background and Overview of Claims

Ginger Hooper is a white female. She began working for TSYS as a manual operator in 1987. During her tenure at TSYS, Hooper held various positions, and she ultimately became "Director, Production" in Card Services. When Hooper was a director, she reported to Senior Director Glen Dean, who reported to Group Executive St. John. Walker Aff. ¶¶ 15, 37.

Hooper asserts that TSYS paid her less than similarly situated male employees and that the pay disparity constitutes wage discrimination under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"). Hooper also maintains that she was terminated because of her gender and in retaliation for complaining about unlawful discrimination. Hooper also asserts a claim for intentional infliction of emotional distress.[5]

---

[5] Hooper alleged a Title VII failure to promote claim, but she withdrew it. Therefore, the Court grants TSYS's motion for summary judgment as to that claim.

TSYS responds that Hooper failed to identify a similarly situated comparator in support of her wage discrimination claims, so those claims fail as a matter of law. TSYS also contends that Hooper made a serious error when 45,630 blank credit cards were misplaced in her area of responsibility. TSYS maintains that Hooper was terminated as a result of that error, combined with a final written warning Hooper had previously received for baring her breasts at a charity function she attended as a TSYS representative. Finally, TSYS denies that it intentionally inflicted Hooper with emotional distress.

B.  Hooper's EPA Claim

1.  *Equal Pay Act Standards*

To prevail on her EPA claim, Hooper must demonstrate that TSYS paid Hooper less than it paid men "for equal work for jobs which require equal skill, effort, and responsibility, and which are performed under similar working conditions." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077-78 (11th Cir. 2003) (internal quotation marks omitted).  If she establishes this prima facie case, then TSYS may avoid liability by proving that the pay differences are based on one of the EPA's four exceptions: "'(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex.'"  *Id.* at 1078 (quoting 29 U.S.C. § 206(d)(1)).  If TSYS meets this burden, Hooper "must

rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Id.* (internal quotation marks omitted).

### 2. *Hooper's Wage Claim Comparators*

Hooper contends that she was paid less than the following male employees: Will Allred, Blake Barker, Steve Davis, Tommy Langley, Peter Muroski, James Reid, and Pat Riccinto.[6] Hooper was never paid less than Riccinto, so Hooper cannot make out an EPA claim based on Riccinto's pay. Walker Aff. Ex. 13, Job and Annual Rate of Pay Report, ECF No. 54-19 at 28-31 of 31.

It is undisputed that Hooper was, for at least one year, paid a lower salary than Allred, Barker, Davis, Langley, Muroski, and Reid, so the Court must determine whether Hooper's job was equal to their jobs in terms of skill, effort, and responsibility.

"The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989). "When Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that the jobs involved must be virtually identical, that is, they would

---

[6] Hooper asserts that she was paid less than male employees from at least 2003 until her termination. The Court focuses on Hooper's pay from 2005 to her termination because Hooper filed her Complaint on September 5, 2008, and the maximum statute of limitations for Hooper's EPA claims is three years. *See* 29 U.S.C. § 255(a).

be very much alike or closely related to each other. The restrictions in the Act were meant to apply only to jobs that are substantially identical or equal." *Id.* (internal quotation marks omitted); *accord Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 592 (11th Cir. 1994) ("The plaintiff need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety.")

In determining whether the jobs are equal, the courts "compare the jobs, not the individual employees holding those jobs." *Mulhall*, 19 F.3d at 592. Therefore, "[o]nly the skills and qualifications actually needed to perform the jobs are considered." *Id.* (internal quotation marks omitted). Furthermore, the courts focus only "on primary, as opposed to incidental or insubstantial job duties." *Id.* "Job titles are a factor for consideration, but are not dispositive." *Id.*

When Hooper was a director in Card Services, she had approximately forty-six employees reporting up to her. *E.g.*, Walker Aff. ¶ 36. Hooper managed an annual expense budget of approximately $2 million. *Id.* Hooper was responsible for overseeing the main and working card vaults and for making sure that blank plastics were accounted for and sent to production for personalization. *Id.* Hooper was also responsible for express mail, plastics purchasing, client relations, and card quality control. *Id.* Hooper did not point to evidence of what

specific tasks she had with regard to her responsibilities or how much effort her responsibilities required.

Hooper asserts that her job was substantially identical or equal to the jobs of the proffered male comparators. TSYS contends that the comparators proffered by Hooper were not similarly situated because they had different job duties, their jobs required more specialized experience, and they had responsibility for more employees and larger budgets. Hooper focuses on job titles and asserts that Output Services production directors all had the same title and generic job description, so she should have been paid the same as the male directors in Output Services. She also contends that she should have been paid more than all Output Services associate directors. The Court disagrees. While "[j]ob titles are a factor for consideration, [they] are not dispositive." *Mulhall*, 19 F.3d at 592. Given that the job titles and job descriptions at TSYS were generic and meant to be used across business units, Walker Aff. ¶¶ 5-6, the Court must focus on the actual job duties of the employees.

Hooper did not, however, point the Court to any evidence of the actual job duties of any of the proffered comparators, and she did not point to evidence that her job required the same skill, effort, and responsibility as the comparators' jobs. With regard to Allred, Barker, Langley, and Reid, it would be

sheer speculation for the Court to conclude that Hooper's job was substantially identical or equal to their jobs. As discussed above, Hooper pointed to evidence of her general areas of responsibility, but she pointed to no evidence of her specific job duties or the amount of effort, skill, and responsibility they required. Moreover, there is nothing in the record that establishes how Hooper's job duties compared to the duties of Allred, an associate director of business systems in the business support department, which included "project management and risk and compliance working with VISA, Mastercard[,] and American Express through audits and site inspections." Walker Aff. ¶ 45. Likewise, there is no evidence of how Hooper's job duties compared to Langley's director role in Statement Services, which included U.S. Postal Service compliance, digital document services, and other support services for Statement Services. Walker Aff. ¶ 43. There is also no evidence of how Hooper's job duties compared to Reid's associate director job in Statement Services, which included responsibility for fifty employees, the production lines on one shift in statement production, and a client relationship role. Walker Aff. ¶ 53. Finally, Hooper did not point the Court to evidence of Barker's actual job duties, so the Court cannot compare Hooper's job to his job. Moreover, the record suggests that Barker, a production director in Statement Services, had

significantly more responsibility than Hooper even though he had the same generic title and worked in a similar environment. Barker had approximately 191 employees and an annual expense budget of $26.5 million, Walker Aff. ¶ 42, while Hooper had only forty-six employees and an annual expense budget of $2 million, *id.* ¶ 36. For all of these reasons, Allred, Barker, Langley, and Reid are not appropriate comparators.

With regard to Davis, it is undisputed that Davis, like Hooper, was a production director in Card Services, though he was responsible for the card personalization and mail preparation phases of production, while Hooper was responsible for the card vault phase, among other things. Hooper contends that she and Davis worked hand in hand to get production done, so there is no real difference in their responsibilities, even though they oversaw different areas. Even if Hooper's area was comparable to Davis's area in terms of complexity, the record still shows that Davis had significantly more responsibility than Hooper even though he had the same generic title and worked in a similar environment. Davis had approximately 128 employees and an annual expense budget of $15 million, Walker Aff. ¶ 20, while Hooper had only forty-six employees and an annual expense budget of $2 million, *id.* ¶ 36. Therefore, Davis is not an appropriate comparator.

Turning to Muroski, it is undisputed that TSYS paid Hooper's successor, Peter Muroski, $75,000 in June 2007 and paid Hooper $68,766 until April 2007. It is also undisputed that when he started at TSYS, Muroski had the exact same job as Hooper, under the same working conditions. Though TSYS contends otherwise, Muroski is an appropriate comparator because "[t]he employees whose pay is the subject of comparison may hold jobs in succession as well as simultaneously." *Pearce v. Wichita Cnty. Hosp. Bd.*, 590 F.2d 128, 133 (5th Cir. 1979).[7] In *Pearce*, the court of appeals found that the female plaintiff's male successor—whose starting salary was more than the plaintiff's salary at the time of her termination—was an appropriate comparator for purposes of the plaintiff's EPA claim. *Id.* For these reasons, the Court finds that Hooper has established a prima facie case of wage discrimination under the EPA with regard to Muroski.

The next question is whether TSYS has established as a matter of law that the salary disparity existed because of "any other factor other than sex." *Steger*, 318 F.3d at 1078 (internal quotation marks omitted). The burden to prove this defense "is heavy and must demonstrate that the factor of sex provided *no basis* for the wage differential." *Id.* (internal

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

quotation marks omitted). "Although an employer may not rely on a *general practice* as a factor other than sex, it may consider factors such as the unique characteristics of the same job; . . . an individual's *experience*, training or ability; or . . . special exigent circumstances connected with the business." *Id.* (citation omitted) (internal quotation marks omitted).

TSYS claims that it paid Muroski more than Hooper because (1) he had more experience than she did, and (2) TSYS had to pay him $75,000 so he would take the job. The record does not establish as a matter of law that Muroski had more experience than Hooper. It is undisputed that Hooper had twenty years of experience in card production at TSYS. Muroski had seventeen years of card production experience, none of them at TSYS. *See generally* Walker Aff. Ex 10, Muroski Application for Employment, ECF No. 54-19. When he applied to TSYS, Muroski had been out of the card production industry for several years. *Id.*

The record also does not establish as a matter of law that TSYS had to pay Muroski $75,000 to induce him to accept the job. According to Muroski's job application, Muroski's desired salary was "75,000 range." *Id.* at TSYSHOOPER001447. Although Muroski represented on his TSYS application that he earned between $85,000 and $100,000 at various points in his career, he represented that he earned $35,000 at the time of his TSYS application. *Id.* at TSYSHOOPER001445.

Again, TSYS has the burden to prove its affirmative defense by a preponderance of the evidence. Based on the present record, the Court cannot conclude that there is no genuine fact dispute on the affirmative defense; a reasonable factfinder could conclude that Muroski did not have more experience than Plaintiff and that TSYS did not have to offer Muroski $75,000 to induce him to accept the job. Accordingly, summary judgment is not appropriate on Hooper's EPA claim based on Muroski's pay.

### C. Title VII Wage Discrimination

In addition to her EPA claim, Hooper brings a wage discrimination claim under Title VII. To establish a prima facie case of intentional compensation discrimination, Hooper must establish that: (1) she belongs to a protected class; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage. *Lee v. Mid-State Land & Timber Co.*, 285 F. App'x 601, 606 (11th Cir. 2008) (citing *Cooper v. S. Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006)). "'In a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him.'" *Id.* (quoting *Cooper*, 390 F.3d

at 735-36). If the plaintiff establishes a prima facie case of wage discrimination, then the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the alleged discrimination. *Mulhall*, 19 F.3d at 597-98. If the employer proffers a legitimate nondiscriminatory reason, then the plaintiff must establish that the proffered reason is pretext for discrimination. *Id.*

Though the standard for "similarity" in Title VII cases is "relaxed" compared to the EPA standard and does not require a showing that the job be substantially identical, Hooper still must prove that her job was "substantially similar" to a higher paid comparator. *Id.* at 598. Even under this relaxed standard, Hooper has not established that her job was substantially similar to the jobs of Allred, Barker, Davis, Langley, and Reid; Hooper relies merely on a comparison of generic job titles and points to little or no evidence regarding the actual job functions and the skill and effort required to perform those functions. Therefore, Hooper cannot base her Title VII wage claim on these purported comparators. Also, as discussed above, Hooper failed to show that she was paid less than Riccinto. Therefore, Hooper cannot base her Title VII wage claim on Riccinto's pay. The only remaining comparator is Muroski.

As discussed above, Hooper made out a prima facie case of wage discrimination under the EPA based on the disparity between her pay and Muroski's; this is sufficient to make out a prima facie case of Title VII wage discrimination. *Mulhall*, 19 F.3d at 598 ("[I]f plaintiff makes a prima facie case under the EPA, she simultaneously establishes facts necessary to go forward on a Title VII claim."). Therefore, the Court turns to TSYS's proffered legitimate nondiscriminatory reasons for paying Muroski more. TSYS claims that it paid Muroski more than Hooper because (1) he had more experience than she did, and (2) TSYS had to pay him $75,000 so he would take the job. As discussed above, a reasonable factfinder could conclude that Muroski did not actually have more experience than Hooper and that TSYS did not have to pay Muroski $75,000 to induce him to accept the job. The record does not conclusively reveal any other nondiscriminatory reason for the pay disparity, so the Court finds that there is a genuine fact dispute as to whether TSYS's reasons for paying Muroski more than Hooper were pretext for discrimination. Therefore, summary judgment is not appropriate on Hooper's Title VII wage discrimination claim based on Muroski's pay.

### D.   Hooper's Termination Claims

The next question is whether Hooper demonstrated a genuine fact dispute regarding her Title VII termination claim. "To

establish a prima facie case of discriminatory discharge, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). Once a plaintiff establishes a prima facie case of discriminatory discharge, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the alleged discrimination. *Id.* at 1235. If the employer proffers a legitimate nondiscriminatory reason, then the plaintiff must establish that the proffered reason is pretext for discrimination. *Id.*

### 1. Hooper's Prima Facie Case

TSYS cannot seriously dispute that Hooper established a prima facie case of discriminatory discharge. She was a member of a protected class, was qualified for the job, and was terminated, effective May 1, 2007. It is undisputed that George Wolbert, a white male, temporarily assumed Hooper's role from May 2007 until TSYS hired Peter Muroski, a white male, as Hooper's permanent replacement on June 25, 2007.

### 2. TSYS's Proffered Nondiscriminatory Reasons

TSYS claims that Hooper was fired because she was partly responsible for a significant error and because she had in her file a final written warning for a serious infraction. It is

undisputed that TSYS would not have terminated Hooper for either of these reasons standing alone.

Hooper argues that neither of these proffered reasons is true.  First, she contends that her final written warning was no longer in effect, so TSYS could not consider it in deciding her punishment.  Second, she asserts that she was not in any way responsible for the significant error TSYS claims she made.  The Court addresses each argument in turn.

### i.  HOOPER'S FINAL WRITTEN WARNING

In August 2004, Hooper attended a vendor-sponsored charity event as a TSYS representative.  *E.g.*, Walker Aff. ¶ 25.  Hooper acknowledges that she "used poor judgment" at the event.  Hooper Aff. I ¶ 66.  During the event, which included a concert by the band Lone Star, Hooper removed her bra and threw it onstage for band members to sign.  *Id.*  When it came time to retrieve the autographed bra, the band members asked whose bra it was, and Hooper "pulled up [her] shirt" to show them that it was her bra. *Id.*  Hooper then attached the bra to her cowboy hat.  *Id.*

After the event, a member of the charity's board complained to a TSYS executive about Hooper's behavior, and Human Resources Director Tracy Walker conducted an investigation.  Walker Aff. ¶¶ 26, 28.  Hooper admitted that her behavior at the charity event was inappropriate.  *Id.* ¶ 29; Hooper Aff. I ¶ 66.  As a result of the incident, Hooper was given a final written warning

on September 3, 2004, and she was demoted to associate director. Walker Aff. ¶ 32; Hooper Aff. I ¶ 68. Hooper was later reinstated to director in 2006; when St. John approved the reinstatement, he emphasized that the promotion would not "rescind the final warning." Dean Dep. Ex. 93, Email from R. St. John to S. Edwards & G. Dean, Mar. 15, 2006, ECF No. 125-4.

Hooper does not quarrel with TSYS's decision to issue the final written warning in 2004. She does, however, contend that it was no longer in effect in 2007, so the final written warning could not serve as a reason for her termination. It is undisputed that disciplinary actions, such as final written warnings, can lead to termination. TSYS pointed to evidence that written disciplinary actions are never purged from an employee's file. *E.g.,* Myhand Dep. 42:1-8, ECF No. 107 (TSYS human resources representative stating that written disciplinary actions are never taken out of the personnel file); Williams Dep. 47:12-22, ECF No. 100 (TSYS human resources representative stating that final written warnings are never purged from employees' files).

Hooper contends that "the disciplinary process recycles every six months, and no discipline is supposed to be in effect or held against an employee past the six-month period." Pls.' SMF 3. However, the evidence Hooper cited in support of this argument suggests that the "six month rule" means that an

employee is ineligible to post for a new job for six months after receiving written discipline, not that the discipline can never be considered again after six months. Walker Dep. 69:20-70:20, 72:23-74:20, ECF No. 102 (explaining that employees who have had written discipline in the previous six months are ineligible to post for another job unless the group executive overrides the rule); *id.* at 83:10-23 (explaining that six-month "recycling" only applies to posting); Williams Dep. 47:12-22 (stating that final written warnings are never purged from the file); *see also* Dean Dep. Ex. 93, Email from R. St. John to S. Edwards & G. Dean, Mar. 15, 2006, ECF No. 125-4 (approving promotion of Hooper to director but stating that promotion would not "rescind the final warning"). Not every employee who receives a final written warning is automatically terminated if the employee has another behavior or performance problem; the level of discipline depends on the circumstances of the case. Walker Dep. 118:23-120:5; *accord* St. John Dep. 92:22-94:4 (stating that effect of final written warning depends on the situation).

One TSYS employee, Pino Davis, a director in Output Services, testified that it was her understanding that an employee had a "clean slate" six months after receiving written discipline unless the final written warning states otherwise. P. Davis Dep. 72:6-73:17, ECF No. 74. Plaintiffs did not point

to any evidence regarding the basis for Ms. Davis's understanding, and Ms. Davis testified that she did not recall receiving any training on TSYS's policy regarding final written warnings. *Id.* at 71:8-11. Ms. Davis was not a human resources representative, and she did not participate in any of the decisions at issue in this action. Furthermore, St. John made it clear in 2006 that Hooper's 2004 final written warning, which is at issue in this case, was not rescinded. For all of these reasons, the Court concludes that Ms. Davis's testimony does not create a genuine fact dispute regarding the effect of Hooper's final written warning in this case. The Court finds that Hooper has not demonstrated a genuine fact dispute on the "six month rule," so TSYS was not barred from considering the 2004 final written warning more than six months after it was issued.

In the alternative, Hooper argues that the final written warning was no longer in effect after she received a merit increase in 2005 and was reinstated to her director position in 2006. TSYS pointed to evidence that it is possible to receive pay increases, stock awards, and bonuses despite a final written warning and that a TSYS employee with a final written warning in her record may post for another job after six months. Walker Dep. 70:3-20, 117:4-25. In response to this argument, Hooper stated in her affidavit that she once consulted with HR regarding the permissible discipline for one of her employees.

Hooper Aff. I ¶ 24. According to Hooper, HR representative Pat Myhand said that the employee could not be terminated despite a final written warning in his file because he had been given a pay increase since he received the final written warning, so "the final written warning was no longer in effect." *Id.* This statement does not create a genuine fact dispute on this issue because it is undisputed that the employee in question was terminated in September 2006 after he had a conflict with one of his coworkers; the employee's termination counseling record referenced the employee's prior discipline for similar problems: a February 2003 final written warning, a June 2004 verbal counseling, and a January 2005 verbal counseling. Def.'s Objection to Pls.' Supplemental Br. Ex. A, TSYS Employee Counseling Record for B. Creed, ECF No. 130. Hooper pointed to no other evidence in support of her argument that a final written warning is no longer in effect after a pay raise or a promotion, so the Court concludes that Hooper has not demonstrated a genuine fact dispute on this issue, and TSYS was not barred from considering the 2004 final written warning after Hooper received a pay raise and a promotion.

In summary, Hooper has not pointed to any evidence to create a genuine fact dispute that her 2004 final written warning was no longer in effect in 2007. Rather, the evidence establishes that a final written warning is always in effect and

that a final written warning may impact the level of discipline for a new infraction. For these reasons, the Court concludes that Hooper has failed to establish that TSYS's explanation that the 2004 final written warning played a role in Hooper's termination is untrue or implausible.

## ii. THE BOA ERROR

TSYS asserts that Hooper was fired as a result of a significant error, which the Court refers to as the "BOA Error." Hooper contends that she was not in any way responsible for the BOA Error, so it could not serve as a basis for her termination. Hooper also argues that even if she were partly responsible for the BOA Error, she was disciplined more harshly than similarly situated male employees.

### a. What Happened

In March 2007, TSYS received an order from a large client, Bank of America ("BOA") for delivery of 45,630 embossed credit cards ("BOA Job"). Kynard Aff. ¶ 5; *accord* Hooper Aff. I ¶ 12. The cards were due to be delivered before April 1, 2007. Kynard Aff. ¶ 5; *accord* Hooper Aff. I ¶ 12 (stating that the job had a mail due date of March 25, 2007).

On March 13, 2007, card vault employees, who reported up to Hooper and Marshall, pulled 45,630 blank plastic cards, placed them in a large blue cage, and transferred the plastics to the card production area for embossing. Kynard Aff. ¶ 6; *accord*

Dean Dep. 56:8-13, ECF No. 106 (stating that when cards are pulled from the vault, they are transferred to the production area). At that time, the plastics were scanned so that TSYS's computerized tracking system would show that they had been moved to the production area. *E.g.,* Dean Dep. 56:4-10.

It is undisputed that Saundra Tatum, an associate director who reported to Steve Davis in the card production area, ordered that the BOA Job be put on hold. Tatum told card vault employees Jason Gentry and Tim Hudson that the cage needed to stay in the vault. Pls.' Resp. Ex. 28, TSYS Employee Counseling Record for S. Tatum, Apr. 27, 2007, ECF No. 63-8; *accord* St. John Dep. Ex. 47 at TSYSMARSHALL000514, Handwritten Statement of J. Gentry. It is undisputed that Gentry and Hudson, who reported up to Plaintiffs, placed the blue cage with the 45,630 blank plastic cards in the main card vault and not the working vault. Gentry and Hudson moved the cage into the main vault, as opposed to the working vault, because space in the working vault was limited. St. John Dep. Ex. 47 at TSYSMARSHALL000514. According to Gentry, Tatum said that she would email Hooper and Marshall and ask them to hold the cards until production asked for them. *Id.* It is undisputed that Tatum did not do so.

The parties appear to agree that it would not have been a violation of TSYS standard operating procedures to keep the 45,630 blank plastic cards in the working vault. It was,

however, unusual for blank plastics that had been scanned out of the main vault and were awaiting production to be returned to the main vault. Kynard Aff. ¶ 7 ("All jobs awaiting production are typically housed in the working vault, not the main vault."); *cf.* Pls.' SMF 31-32 (emphasizing that Gentry and Hudson put a "prominent sign" on the blue cage once it was placed in the main vault). Gentry put a prominent sign on the cage: "B of A Reissue Job Needs to Stay Back Here Until Asked For Jay." St. John Dep. Ex. 47 at TSYSMARSHALL000522; *accord* St. John Dep. Ex. 47 at TSYSMARSHALL000514. There were, however, many other blue cages holding jobs in the working vault and the main vault. Hooper Aff. I ¶ 13.

It is undisputed that on March 27, 2007, a machine operator named LeArtis Allen, who reported up to Steve Davis, made an entry into TSYS's computerized tracking system reflecting that the BOA Job had been completed and mailed, even though the 45,630 cards were still in the main vault awaiting production. It is also undisputed that Allen did not have the proper supporting paperwork to make this entry. TSYS contends that Allen simply made a mistake, though Plaintiffs pointed to evidence that Allen stated that someone (who remains unnamed) told him to make the entry. Pls.' Resp. Ex. 29, TSYS Employee Counseling Record for L. Allen, ECF No. 63-9. It is undisputed that after Allen made the entry in the system, the system showed

that the BOA Job was complete, so TSYS's daily reports did not reflect that the BOA Job still needed to be processed.[8]

It is undisputed that the 45,630 cards remained in the main vault until April 12, 2007, although they were supposed to be delivered to BOA by April 1, 2007. BOA inquired about the status of the order at least three times. Kynard Aff. ¶ 12. In response to those inquiries, Hooper investigated the issue and had her employees look for the blue cage containing the 45,630 cards. Hooper Aff. I ¶ 13. Ultimately, Hooper's team located the cage in the main vault. *Id.*

The cards were delivered to BOA, though they were late. According to Kynard, the late delivery of the BOA Job "caused TSYS extreme embarrassment and jeopardized its relationship with Bank of America." Kynard Aff. ¶ 14; *id.* ¶ 19 (stating that BOA Error caused BOA "to question whether it wanted to retain its business with TSYS"). Plaintiffs deny this assertion but point to no evidence to rebut it. Plaintiffs point to no evidence regarding the communications between TSYS and BOA. Plaintiffs point to evidence that BOA Debit Card Services SVP Stacy Maschsoff sent Rick St. John a complimentary letter about Steve Davis's work, which was incorporated into Glen Dean's October 2007 recommendation that Davis receive a developmental pay

---

[8] According to Hooper, it was a continuing problem for production employees, who reported to Steve Davis, to "mail jobs off the system" before the cards were actually processed and mailed. Hooper Aff. ¶ 15. In February 2007, Hooper expressed her concerns about this issue to Glen Dean, but the problem was not resolved at that time. *Id.*

increase. St. John Dep. Ex. 51, TSYS At-Desk Promotion/ Developmental Increase Evaluation Form for S. Davis, Oct. 8, 2007, ECF No. 121-8. The letter does not establish that the BOA Error had no negative impact on TSYS's relationship with BOA in April 2007.

### b. The Investigation

It is undisputed that HR representative Susan Edwards investigated the BOA Error. It is also undisputed that Kynard, St. John, Dean, Edwards, and HR Director Tracy Walker met to discuss the BOA Error on April 26, 2007. Finally, it is undisputed that a number of TSYS employees were disciplined as a result of the BOA Error. There is a dispute about who ultimately made the employment decisions. According to TSYS, it was Kynard. Kynard Aff. ¶¶ 18, 21. Plaintiffs point to a "Memorandum For Record" from St. John and note that St. John recommended each of the disciplinary actions that Kynard later approved. St. John Dep. Ex. 47 at TSYSMARSHALL000524 to 529, Memorandum For Record from R. St. John, Apr. 18, 2007, ECF No. 54-16 at 96-101 [hereinafter St. John Memo]. Based on this evidence, the Court finds that there is a genuine fact dispute that St. John made the employment decisions related to the BOA Error and that Kynard merely ratified them.

### c.  Hooper's Discipline for the BOA Error

It is undisputed that St. John recommended to Kynard that Hooper be given a second final written warning and be terminated as a result of the BOA Error.  Kynard concurred with St. John's recommendation.  According to St. John, he recommended terminating Hooper because in his view, the error was "critical," it jeopardized a "huge client's business," and it was "completely avoidable."  *E.g.,* St. John Dep. 59:7-12; *accord* St. John Dep. Ex. 47 at TSYSMARSHALL000479 to 480, Employment Determination for G. Pair (Hooper).  St. John found that Hooper "fostered an environment within which the error could occur." St. John Memo at TSYSMARSHALL000525 to 526.  He also found that Hooper "failed in [her] responsibilities resulting in an error of such magnitude that it could warrant termination under normal circumstances."  *Id.* at TSYSMARSHALL000528.  In addition, Hooper already had a final written warning in her file for embarrassing TSYS.  St. John Dep. 59:12-14; *accord* St. John Memo at TSYSMARSHALL000528 to 529 (recommending termination "in light of previous disciplinary problem").  As discussed above, the 2004 final written warning was still in effect.

Hooper contends that she had no responsibility for the BOA Error and that it could not be a basis for her termination.  As discussed above, for purposes of her wage claim, Hooper argues that there is no real distinction between her job and Steve

Davis's card production job.  Hooper and Marshall both emphasize that they worked hand in hand with Davis's team to get production done.  With regard to the BOA Error, however, Plaintiffs seek to distance themselves from Davis's team— insisting that none of the card vault employees were to blame for the BOA Error and that the entire error was caused by Davis and his employees.  Plaintiffs contend that once the 45,630 cards were scanned out of the card vault, the matter was out of their hands and that they had no further obligation because neither they nor their team members violated any TSYS standard operating procedures.

As discussed above, Hooper and Marshall were responsible for managing the card vault, in addition to their other responsibilities.  Part of Plaintiffs' card vault responsibility was to create and implement procedures to ensure that the blank credit cards in the card vault were properly accounted for and pulled.  *E.g.,* Kynard Aff. ¶ 13; St. John Aff. ¶ 12.  Plaintiffs note that this specific task was not listed in their generic job descriptions or their performance reviews.  Nonetheless, Hooper acknowledges that card vault employees were responsible for "pulling, verifying, and balancing each card order," Hooper Aff. I ¶ 51, and Hooper admits that she and her team were responsible for keeping their standard operating procedures updated, Pls.' SMF 26.  It is undisputed that Plaintiffs' employees put the

45,630 cards in the main vault—Plaintiffs' area. It is undisputed that the cards sat there for approximately three weeks. And it is undisputed that after BOA called at least three times to ask the status of the BOA Job, Hooper's team did a physical inspection and found the cards in the card vault.

In a nutshell, the undisputed evidence establishes that it was reasonable for St. John and Kynard to believe that the BOA Error occurred because there was no process in place to handle the 45,630 cards once production placed them on hold. Production did not have a process for notifying the vault that it was sending the cards back, and the vault did not have a process for logging the cards back into the vault's inventory when vault employees placed them back in the main vault. As a result, the 45,630 cards were not included in the card vault's inventory even though they were physically in the main vault. It was not unreasonable for St. John to conclude that both production and the vault lacked sufficient processes for handling card holds and that the lack of such processes caused the BOA Error. Moreover, it was not unreasonable for St. John to believe that Plaintiffs were at least partly to blame for the process failure; although they seek to distance themselves from the rest of production with regard to the BOA Error, Plaintiffs assert that they "assisted in determining ways to correct and

prevent errors in the entire production process, not just the vault." Hooper Aff. I ¶ 6.

Furthermore, it was reasonable for St. John to conclude that the BOA Error occurred in part because Hooper and Marshall did not regularly inspect the card vault. According to St. John, Hooper and Marshall were responsible for regularly inspecting the card vault. St. John Aff. ¶¶ 12, 15. In response, Plaintiffs assert that (1) such inspections were not in their job description, (2) no one ever told them to conduct such inspections, and (3) such inspections were impractical given the size of the card vault and the other audit systems in place. Pls.' SMF 26; Hooper Aff. I ¶ 36.

It is undisputed that card vault inspections were not in Plaintiffs' generic job descriptions. It is also undisputed that TSYS uses the same basic job descriptions across its business units. Walker Aff. ¶ 6. Therefore, it is not probative that the inspection requirement was not included in Plaintiffs' generic job descriptions.

There is a dispute as to whether St. John told Hooper to inspect the vault. He asserts that he told Hooper to inspect the vault. St. John Memo at TSYSMARSHALL000525. She says it never happened. Hooper Aff. I ¶ 36. Whether or not St. John actually told Hooper to do the inspections, St. John believed that it was an "inherent task for any leader" to walk around and

inspect his or her work area. St. John Memo at TSYSMARSHALL000525.

Plaintiffs cannot seriously dispute that St. John believed they should inspect the card vault, but they do contend that such inspections were impractical because it would be "impossible" to check the jobs by physically walking through the vault. Hooper Aff. I ¶ 11 (stating that the only way for Hooper and her team to know that a job was not done was a computerized tracking system); *id.* ¶ 36 (noting that TSYS instituted a computerized tracking system because "it was impossible to 'check on jobs' by just physically walking through the vault"). The evidence, however, shows that Hooper's team actually found the 45,630 cards in the main vault by walking through the vault. Hooper Aff. I ¶ 13. The evidence also shows that the computerized tracking system on which Plaintiffs relied was not infallible, suggesting that a manual back-up process, such as a physical inspection, should be established for both production and the card vault. For all of these reasons, it was not unreasonable for St. John to conclude that routine inspections by Plaintiffs would have helped to prevent the BOA Error.

In summary, Plaintiffs have not pointed to sufficient evidence to create a genuine fact dispute that they were not partly to blame for the BOA Error. Rather, the evidence suggests that it was reasonable for St. John and Kynard to

conclude that Hooper and Marshall were partly responsible for the BOA Error and that the BOA Error was a significant error that jeopardized an important client relationship.

### d. Hooper's Termination Claim Comparators

Hooper argues that even if she was partly responsible for the BOA Error, she was disciplined more harshly than similarly situated male employees. In determining whether other employees were similarly situated to Hooper, the Court must evaluate whether the other employees were "involved in or accused of the same or similar conduct" but "disciplined in different ways." *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (internal quotation marks omitted). The "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* (alteration in original) (internal quotation marks omitted).

Hooper contends that she was similarly situated to but disciplined differently than all male employees in Output Services. In her briefing and at the summary judgment hearing, Hooper named the following male comparators who she contends were similarly situated but were not terminated: Blake Barker, Steve Davis, Glen Dean, Jonathon Fraley, Darrel Harris, Peter Muroski, Simon Strothers, and Mike Whitaker. TSYS argues that

none of these employees was similarly situated to Hooper.  The Court analyzes each comparator in turn.

Blake Barker.  Hooper contends that TSYS disciplined "Barker at a low level of discipline for what normally demands immediate termination."  Pls.' Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 17, ECF No. 68.  Hooper did not explain what Barker did that "normally demands immediate termination." Barker was not involved in the BOA Error.  Hooper did not point to any evidence that Barker was responsible for a significant error with negative ramifications to an important client relationship.  Therefore, the Court cannot conclude that Barker is a nearly identical comparator to Hooper for purposes of her discriminatory discharge claim.

Steve Davis.  Davis, a white male director, received a final written warning as a result of the BOA Error.  St. John found that Davis failed in his leadership and "fostered an environment within which the error could occur and that did not enforce strict accountability of job completion at the end of the production process."  St. John Memo at TSYSMARSHALL000526. St. John found that Davis, like Hooper, "failed in [his] responsibilities resulting in an error of such magnitude that it could warrant termination under normal circumstances."  *Id.* at TSYSMARSHALL000528.  St. John recommended written counseling instead of termination because Davis had a "spotless record" and

because of Davis's "dedication," "hard work," and "personal sacrifice." *Id.* at TSYSMARSHALL000529*; accord* St. John Dep. 141:1-25 (stating that lack of final written warning in Davis's file was a factor in St. John's decision to recommend that Hooper be terminated and Davis be retained).

Hooper asserts that Davis and his team were responsible for the BOA Error and that if anyone should have been fired for the BOA Error, it should have been Davis. As discussed above, however, it was reasonable for St. John and Kynard to believe that Hooper shared responsibility for the BOA Error with Davis and that both Davis and Hooper fostered an environment within which the error could occur. Therefore, the Court concludes that Davis and Hooper engaged in nearly identical conduct.

The next question is whether Davis and Hooper were similarly situated. The Court finds that they were not. The difference: Davis did not have a final written warning in his file, but Hooper did. *E.g., Jiles v. United Parcel Serv., Inc.*, 360 F. App'x 61, 64 (11th Cir. 2010) (per curiam) ("[T]he determination of whether employees are similarly situated may involve consideration of the employees' records with respect to their histories of problems with coworkers or supervisors, job performance, tardiness, absenteeism, and responsiveness to performance evaluations.").

Hooper argues that Davis really was similarly situated to her because he *should have* had a final written warning in his file prior to the BOA Error and that Davis committed serious errors after the BOA Error but was not fired despite the final written warning. Hooper pointed to evidence that Davis's superiors had some concerns about Davis's job performance after the BOA Error, Pls.' Resp. Ex. 39, Memo from G. Dean to S. Davis, Nov. 26, 2007, ECF No. 64-7, but she pointed to no evidence that Davis committed errors that St. John or Kynard considered to be remotely as significant as the BOA Error, either before or after the BOA Error. For these reasons, Davis is not a proper comparator for Hooper's discriminatory discharge claim.

Glen Dean. Hooper points to her boss, Glen Dean, as a similarly situated individual who engaged in nearly identical conduct but was not terminated. It is undisputed that Dean, a white male senior director who reported directly to St. John, did not receive any formal discipline as a direct result of the BOA Error, though he did not receive a bonus or a full stock award because of the BOA Error. Kynard Aff. ¶ 31. Plaintiffs deny this assertion but point to no evidence to rebut it.

Hooper appears to argue that if she could be terminated for the BOA Error, then Dean should have been similarly disciplined. But, even if Hooper had pointed to evidence that Dean had

similar culpability for the BOA Error—which she did not—there is no evidence that Dean had a final written warning in his file. Hooper points out that St. John removed Dean from his leadership role in Card Services because of his failure to improve. Pls.' Resp. Ex. 49, Memo from R. St. John to G. Dean, Jan. 10, 2008, ECF No. 65-4. There is no evidence, however, that Dean's performance issues were similar to Hooper's, and Dean is therefore not an appropriate comparator.

Jonathon Fraley. Hooper contends that she was similarly situated to Jonathon Fraley, an employee who worked in Statement Services during Hooper's tenure at TSYS. Fraley was not involved in the BOA Error. Hooper takes issue with the fact that Fraley received a promotion despite a final written warning in his file. Hooper likewise received a promotion despite a final written warning in her file. Hooper also appears to suggest that Fraley committed significant errors after he received his final written warning, though Hooper did not point the Court to evidence that Fraley committed any errors that were as significant as the BOA Error. Therefore, Fraley is not an appropriate comparator.

Darrel Harris. Hooper asserts that she was similarly situated to Darrel Harris, an associate director who reported to Steve Davis in card production. Harris was not involved in the BOA Error. Hooper contends that Harris was responsible for

numerous client errors but was not terminated.  Hooper, however, did not point the Court to evidence that Harris committed any errors that were as significant as the BOA Error.  Therefore, Harris is not an appropriate comparator.

Peter Muroski.  Hooper argues that she was similarly situated to her successor, Peter Muroski.  Muroski was not involved in the BOA Error.  He was involved in another significant error, and he received a first written warning as a result of it.  Plaintiffs contend that Muroski's error was nearly identical to Hooper's conduct with regard to the BOA Error.  Even if that is the case, Hooper and Muroski were not similarly situated.  Muroski received a first written warning instead of harsher punishment because he had no disciplinary record prior to his error and his tenure at TSYS had been relatively short.  Barker Dep. 31:23-32:2, ECF No. 96.  In contrast, Hooper had the final written warning for inappropriate behavior as a TSYS representative at a charity event.  For these reasons, Muroski is not an appropriate comparator.

Simon Strothers.  Hooper also argues that she was similarly situated to Simon Strothers, a production manager in card production.  Strothers was not involved in the BOA Error.  Hooper contends that Strothers was responsible for numerous client errors but was not terminated.  Hooper, however, did not point the Court to evidence that Strothers committed any errors

that were as significant as the BOA Error. For these reasons, Strothers is not an appropriate comparator.

   Mike Whitaker.   Finally, Hooper argues that she was similarly situated to, but disciplined more harshly than, Mike Whitaker, a senior service level analyst in the production area who reported up to Steve Davis.

   Plaintiffs suggest that Whitaker should have been punished for the BOA Error but was not. According to Hooper, Whitaker was responsible for running the daily reports regarding what jobs still needed to be completed. Hooper Aff. I ¶ 11. Whitaker reported on March 23, 2007 that the 45,630 cards still needed to be processed. Davis Dep. Ex. 9, Email from M. Whitaker to J. Hubbard, et al., Mar. 23, 2007, ECF No. 117-9. After LeArtis Allen entered the BOA Job as mailed in the TSYS tracking system, Whitaker could not tell that the BOA Job had not, in fact, been mailed, and "there were no other indicators" in Whitaker's area of responsibility to suggest that the BOA Job had not been mailed. Kynard Aff. ¶ 33. Therefore, Whitaker concluded that the BOA Job had been completed, and his daily reports no longer reflected that it was pending.

   Plaintiffs contend that it was unfair for TSYS to discipline them and not Whitaker because Whitaker had the "exact same indicator" Plaintiffs had for determining that the BOA Job was complete: the TSYS tracking system. Pls.' SMF 61.

Whitaker, however, was not a card vault manager, and the blue cage with the 45,630 cards was not in his work area. For these reasons, the Court concludes that Whitaker did not engage in similar misconduct; therefore, Whitaker is not an appropriate comparator.

### e. Summary: Hooper's Proffered Comparators

As discussed above, Hooper has not pointed the Court to any *similarly situated* male employees who were disciplined less harshly than she was. Therefore, the Court cannot find that there is a genuine fact dispute regarding whether TSYS's proffered reason for Hooper's termination is pretext, and TSYS is entitled to summary judgment on Hooper's discriminatory discharge claim.

### E.   Title VII Retaliatory Termination

To establish a prima facie case of retaliation under Title VII, "the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

Viewing the evidence in the light most favorable to Hooper, Hooper did make several complaints that were arguably protected activity. First, in September 2006, Hooper complained that a co-worker named George Wolbert was making her feel

uncomfortable.  Hooper Aff. I ¶ 39.  Second, sometime prior to October 2006, Hooper complained to St. John that Marshall, who was a manager at the time, should be promoted to associate director.  *Id.* ¶ 50.  Third, in November 2006, Hooper complained to a human resources representative that co-worker Blake Barker had called her a "skank" and that she was not treated as well as the male employees.  Williams Dep. 58:16-59:22.

However, Hooper has not pointed to any evidence to establish a causal connection between these complaints and her termination, which occurred in late April of 2007.  Causation can be established "by showing close temporal proximity between the statutorily protected activity and the adverse employment action."  *Thomas*, 506 F.3d at 1364.  "But mere temporal proximity, without more, must be 'very close.'"  *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."  *Id.*  "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."  *Id.*  Here, there was a disparity of at least five months between the 2006 complaints and the adverse employment action.  Accordingly, Hooper has not made out a prima facie case of retaliation with regard to her 2006 complaints.

Hooper also claims that she engaged in protected activity in February of 2007, shortly before she was fired, when she complained to Glen Dean regarding Steve Davis's alleged work violations. For Hooper's complaint about Steve Davis to be protected activity for purposes of a Title VII retaliation claim, Hooper must establish that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Dixon v. The Hallmark Cos.*, 627 F.3d 849, 857 (11th Cir. 2010). Hooper pointed to no evidence that her complaint to Dean was about any alleged unlawful employment practice. Rather, Hooper's complaint regarding Davis was a whistleblower complaint rather than a complaint regarding race or sex discrimination. For this reason, Hooper has not made out a prima facie case of retaliation with regard to her 2007 complaint. Given that Hooper failed to establish a prima facie case of retaliation, TSYS is entitled to summary judgment on her retaliation claim.

### F.    Intentional Infliction of Emotional Distress

"The elements of a cause of action for intentional infliction of emotional distress are: (1) intentional or reckless conduct; (2) that is extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress." *Ferrell v. Mikula*, 295 Ga. App. 326, 333, 672 S.E.2d 7, 13 (2008). Even if

Hooper had established all of the other elements of an intentional infliction of emotional distress claim, she has not established that she suffered severe emotional distress. Emotional distress "includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Abdul-Malik v. AirTran Airways, Inc.,* 297 Ga. App. 852, 858, 678 S.E.2d 555, 560 (2009) (internal quotation marks omitted). The emotional distress must be "so severe that no reasonable [person] could be expected to endure it." *Id.* (alteration in original) (internal quotation marks omitted). Though Hooper summarily "denies that she did not experience severe emotional distress," she points to no evidence that she actually experienced severe emotional distress. Pls.' SMF 66. Accordingly, TSYS is entitled to summary judgment on her intentional infliction of emotional distress claim. *Cf. Abdul-Malik*, 297 Ga. App. at 858, 678 S.E.2d at 560 (finding no severe distress where plaintiff did not take medication or seek professional help and suffered only some sleeplessness and gradual weight gain).

## III. Larry Marshall's Claims

### A. Background and Overview of Claims

Larry Marshall is a black male. He began working for TSYS as a supply clerk in 1987. During his tenure at TSYS, Marshall

held various positions, and, in February 2001, he became "Manager, Production" in Card Services. In September 2005, Marshall assumed responsibilities for the card vault and express mail. On October 1, 2006, Marshall was promoted to "Associate Director, Production" in Card Services. Walker Aff. ¶¶ 16, 38. When he was associate director, Marshall reported to Hooper, who reported to Dean, who reported to St. John. *Id.* ¶¶ 15, 37, 38. It is undisputed that after the BOA Error, Peter Muroski replaced Hooper as the director responsible for the card vault and as Marshall's supervisor. Later in 2007, Blake Barker replaced Glen Dean as senior director of Card Services.

Marshall alleges that he was paid less than similarly situated white employees, was denied promotional opportunities because of his race, and was terminated due to his race and in retaliation for complaining about unlawful discrimination. Marshall also asserts a claim for intentional infliction of emotional distress.

TSYS responds that Marshall identified no similarly situated comparators to support his discriminatory pay claim. TSYS also contends that Marshall did not apply for a promotion and that even if he did, the person TSYS selected was better qualified for the job than Marshall. TSYS maintains that Marshall was terminated because he was responsible for a serious error when TSYS sent 200,000 of the wrong client's blank credit

cards to TSYS's competitor ("Metabank Error"). Finally, TSYS denies that it intentionally inflicted emotional distress upon Marshall.

B.    Title VII and 42 U.S.C. § 1981 Wage Discrimination

Marshall claims that he was paid less than similarly situated white employees, in violation of Title VII and § 1981.[9]

To establish a prima facie case of wage discrimination, Marshall must prove that: "(1) he belongs to a racial minority; (2) received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive the higher wage." *Lee*, 285 F. App'x at 606.

Marshall contends that he was paid less than the following white employees: Will Allred, Jody Andrews, David Clepper, Jonathon Fraley, Darrel Harris, Jim Reid, Pat Riccinto, and Will

---

[9] TSYS contends that Marshall's Title VII wage discrimination claim is barred because he did not raise it in his charge to the Equal Employment Opportunity Commission. Marshall's parallel § 1981 claim is not subject to the administrative exhaustion requirement, so the Court still must analyze the merits of the wage claim. The Court concludes that Marshall's wage claims fail on the merits, so the Court need not consider whether the Title VII wage claim is barred for failure to exhaust administrative remedies.

TSYS also argues that Marshall did not raise a wage claim in his Complaint, but he did allege in his initial Complaint that TSYS denied him pay increases and bonuses "that were provided to similarly situated white males." Compl. ¶ 8, ECF No. 1-4. That allegation was incorporated into Marshall's First Amended Complaint, in which Marshall added allegations under Title VII and § 1981, asserting that TSYS's actions against him were "discriminatory based on his race." 1st Am. Compl. ¶¶ 51, 56, ECF No. 1-6. All of Marshall's allegations were incorporated into Marshall's Second Amended Complaint. 2d Am. Compl. 1, ECF No. 9. The Court is satisfied that Marshall adequately alleged § 1981 wage discrimination.

Smith.  Marshall was never paid less than Fraley.  *See* Walker
Aff. Ex. 13, Job and Annual Rate of Pay Report, ECF No. 54-19 at
26-31 of 31.  Marshall takes issue with the fact that he and
Fraley were paid the same bonus in 2007, but there is no
evidence that Fraley received *higher* compensation.  Therefore,
Marshall cannot make out a wage discrimination claim based on
Fraley's pay.

There is evidence that Marshall was, for at least one year,
paid a lower salary than Allred, Andrews, Clepper, Harris,
Riccinto, and Smith.[10]  The Court must determine whether Marshall
was similarly situated to these employees.  Again, an
appropriate comparator is a person "who ha[s] very similar job-
related characteristics and who [is] in a similar situation."
*Lee*, 285 F. App'x at 606 (internal quotation marks omitted).
"The plaintiff must show that he shared the same type of tasks
as the comparators.  A comparator is an employee similarly
situated to the plaintiff in all relevant respects."  *Id.*
(citation omitted) (internal quotation marks omitted).

When he was an associate director, approximately forty
employees reported up to Marshall.  Walker Aff. ¶ 39.  Marshall
was responsible for overseeing the main and working card vaults,

---

[10] Andrews was paid less than Marshall in 2004, 2005, and 2006.  Walker
Aff. Ex. 13, Job and Annual Rate of Pay Report, ECF No. 54-19 at 27-30
of 31.  In 2007, Andrews's salary was $376 higher than Marshall's
salary.  *Id.* at 31 of 31.  Smith was paid less than Marshall in 2004,
2005, and 2006.  *Id.* at 27-30 of 31.  In 2007, Smith's salary was $9
higher than Marshall's salary.  *Id.* at 31 of 31.

and making sure that blank plastics were accounted for and sent to production for personalization. Marshall was also responsible for express mail and quality assurance. Marshall did not point to evidence of what specific tasks he had with regard to these responsibilities or how much effort and skill these responsibilities required.

Marshall asserts that his job was substantially similar to the jobs of the proffered white employees. TSYS contends that the comparators proffered by Marshall were not similarly situated because they had different job duties, their jobs required more specialized experience, and they had responsibility for more employees and larger budgets. Like Hooper, Marshall argues that the Court should simply focus on the generic job title and job description, which was the same for all managers and associate directors in Output Services. As discussed above, however, the Court must focus on the actual job duties of the employees.

Marshall did not point the Court to any evidence of the actual job duties of any of the proffered comparators. Rather, he relies mainly on job titles and asserts that he should have been paid the same as other managers while he was a manager and the same as other associate directors while he was an associate director. Marshall did not point to any evidence of the proffered comparators' job functions, and he did not point to

evidence that his job required the same skill, effort, and responsibility as the comparators' jobs. For example, although there is evidence of Marshall's general areas of responsibility, there is nothing in the record that establishes how Marshall's actual job duties compared to Allred's job duties, which included "project management and risk and compliance working with VISA, Mastercard and American Express through audits and site inspections." Walker Aff. ¶ 45. Likewise, Marshall pointed to no evidence of how his job duties compared to the duties of Andrews, Reid, Riccinto, and Smith, who were each responsible for fifty employees and for all production lines in Statement Services during one shift. Walker Aff. ¶¶ 47, 49, 53, 54. There is also no evidence of how Marshall's job duties compared to the duties of David Clepper, who was a manager, relationship management, then an associate director, relationship management in a department outside of Card Services. Walker Aff. ¶ 48. Finally, the record suggests that Harris had significantly more responsibility than Marshall because he supervised approximately 100 employees and was responsible for accounting and finance, budgeting, purchasing, and vendor management. Walker Aff. ¶ 51.

In summary, Marshall has not pointed the Court to any *similarly situated* white employees who were paid more than he was. Marshall simply pointed the Court to individuals who had

the same generic job title as him who were paid more. Marshall's burden is higher than that; he must point to some evidence that he shared "very similar job-related characteristics" and the "same type of tasks." *Lee*, 285 F. App'x at 606. Therefore, the Court cannot find that Marshall has established a prima facie case of wage discrimination, and TSYS is entitled to summary judgment on Marshall's wage discrimination claims.

## C. Section 1981 Discriminatory Discipline

Marshall received a final written warning for his role in the BOA Error, which is discussed above. Marshall asserts a § 1981 discriminatory discipline claim against TSYS based on that final written warning. Standing on its own, the final written warning is not an actionable "adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1241 (11th Cir. 2001). TSYS did, however, rely on the final written warning in terminating Marshall's employment, so the Court considers the final written warning below in deciding Marshall's discriminatory discharge claim. *Cf. id.* at 1240 (suggesting that negative employment evaluation is actionable if employee suffers "tangible consequence" from it, such as "further discipline"); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (stating that negative employment evaluation that did not result in any effect on employment was not actionable but

suggesting that adverse employment action may exist if employer *relies on* evaluation to make employment decisions).

D. <u>Title VII and § 1981 Failure to Promote</u>

Marshall alleges that TSYS denied him promotional opportunities. In the failure-to-promote context, the prima facie case consists of showing the following elements: (1) that the plaintiff belongs to a protected class; (2) that he applied for and was qualified for a promotion; (3) that he was rejected despite his qualifications; and (4) that other equally or less-qualified employees outside his protected class were promoted. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004).

Marshall did not point to any evidence that he applied for and was denied a promotion during or after 2004. Plaintiffs suggest that Marshall should have been considered for Hooper's director position after Hooper was terminated, but they offer no evidence that Marshall posted for the position.

Marshall argues that it would have been futile for him to post for the director position because of the final written warning in his file, so the Court should ignore that element of the prima facie case. Even if there is a genuine fact dispute on this issue, Marshall has not pointed to evidence that he was qualified for the director job. Moreover, even if the Court assumes that Marshall has established a prima facie case of

discriminatory failure to promote, TSYS asserts that Peter Muroski, who was hired to fill the director job, was more qualified than Marshall. To create a genuine fact dispute on whether this proffered reason is pretext for discrimination, Marshall "must show that the disparities between the successful applicant's and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over" him. *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Marshall has pointed to no evidence of such disparities between him and Muroski. As discussed above, Muroski had more than seventeen years of experience in card production, and he had previously built and managed his own credit card production company. He also had significant management experience. In summary, Marshall has not shown that a fact dispute exists on whether TSYS's proffered reason for selecting Muroski was unworthy of credence or that discrimination was the real reason for TSYS's decision to select Muroski. Accordingly, TSYS is entitled to summary judgment on Marshall's failure to promote claim.

E.  Title VII and § 1981 Discriminatory Termination

    1.  *Marshall's Prima Facie Case*

The next question is whether Marshall demonstrated a genuine fact dispute regarding his Title VII and § 1981

termination claims. Marshall may establish a prima facie case of discriminatory discharge by showing that he "(1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." *Cuddeback*, 381 F.3d at 1235.

TSYS does not dispute that Marshall established a prima facie case of discriminatory discharge—he was a black male who was qualified for the job, and he was terminated. Marshall was replaced by Jonathon Fraley, a white male. Walker Aff. ¶ 55.

### 2. TSYS's Proffered Nondiscriminatory Reasons

TSYS contends that Marshall was terminated because he was responsible for the Metabank Error, a serious error when TSYS sent 200,000 of the wrong client's blank credit cards to TSYS's competitor, *and* because he had a final written warning in his file. Marshall argues that these reasons are pretext for discrimination because, among other things, TSYS discriminated against Marshall when it gave him the final written warning for the BOA Error. The evidence suggests that if Marshall had not had the BOA Error final written warning in his file, he would not have been terminated for the Metabank Error. There is no evidence that Marshall would have been terminated for the Metabank Error had he received a first written warning instead of a final written warning for the BOA Error. The Court must

therefore determine whether there is a genuine fact dispute as to whether the BOA Error final written warning—which was the deciding factor in Marshall's termination—was discriminatory.

It is undisputed that St. John recommended that Marshall be given a final written warning as a result of the BOA Error. St. John found that Marshall, like Hooper, failed to inspect the vault periodically, even though such inspection "is an inherent task for any leader." St. John Memo at TSYSMARSHALL000525. St. John also found that Marshall failed to notice the blue cage with the 45,630 cards even though he visited the main vault more than thirty times in March 2007. *Id.* Marshall, like Hooper, also received the written warning because there was no written policy in place and no training to ensure that all cards were accounted for and prevent this sort of error from happening. Kynard Aff. ¶ 27; *id.* Ex. 7, TSYS Employee Counseling Record for L. Marshall, ECF No. 54-10, at TSYSHOOPER001704. As discussed above, it was reasonable for St. John and Kynard to conclude that Marshall was partly responsible for the BOA Error and that the BOA Error was a significant error that jeopardized an important client relationship.

Marshall argues that even if he was partly responsible for the BOA Error, similarly situated white employees were disciplined less harshly than he was. In determining whether Marshall's final written warning for the BOA Error amounted to

discriminatory discipline, the Court must evaluate whether another employee was "involved in or accused of the same or similar conduct" but "disciplined in different ways." *McCann*, 526 F.3d at 1373 (internal quotation marks omitted); *accord Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276 (11th Cir. 2008). The "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *McCann*, 526 F.3d at 1373 (alteration in original) (internal quotation marks omitted).

Marshall contends that he was similarly situated to but disciplined differently than all white employees in Output Services, including Woodrow Winters, a white male associate director who reported to Steve Davis. It is undisputed that Winters was involved in the BOA Error and that he received a *first* written warning. St. John found that production middle management, including Winters, had a pattern of "circumventing proper procedures" or condoning such actions to meet deadlines. St. John Memo at TSYSMARSHALL000526. St. John also found that card production managers regularly told their employees to enter jobs as mailed when the jobs had not been completed. *Id.* Winters also received the warning because he did not develop and adhere to processes for timely and accurate delivery of card production jobs. Kynard Aff. ¶ 29; *id.* Ex. 9, TSYS Employee

Counseling Record for W. Winters at TSYSHOOPER001708, ECF NO. 54-10.

Based on this evidence, Marshall and Winters engaged in similar misconduct. They had similar jobs. Both failed to perform important functions of their jobs—Marshall by failing to inspect the vault and Winters by permitting his team to circumvent proper procedures. And both failed to develop and implement processes that would have prevented the BOA Error. TSYS offers no explanation why Winters received a first written warning while Marshall received a final written warning. Moreover, TSYS offers no explanation why it treated the associate director in the card vault (Marshall) differently than the associate director in card production (Winters) when TSYS found that the director in the card vault (Hooper) deserved the same level of discipline as the director in card production (Davis).[11]

In summary, the present record does not reveal any nondiscriminatory reason for disciplining Marshall and Winters differently for the BOA Error. Therefore, the Court finds that there is a genuine fact dispute as to whether Marshall's race was a motivating factor in TSYS's decision to issue Marshall the final written warning. Because the undisputed evidence suggests

---

[11] As discussed above, for Hooper, the BOA Error final written warning resulted in termination because Hooper already had a final written warning in her file.

that TSYS relied on the BOA Error final written warning as the determining factor in Marshall's termination for the Metabank Error, the Court concludes that TSYS is not entitled to summary judgment on Marshall's Title VII and § 1981 discriminatory discharge claims. *C.f., Lucas*, 257 F.3d at 1261 (suggesting that adverse employment action may exist if employer relies on negative evaluation to make employment decisions); *Davis*, 245 F.3d at 1240 (suggesting that negative employment evaluation is actionable if employee suffers "tangible consequence" from it, such as "further discipline").

F.    Title VII and § 1981 Retaliatory Termination

The Court now turns to Marshall's retaliatory termination claims. To establish a prima facie case of retaliation, Marshall must show that (1) he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relation between the two events. *Thomas*, 506 F.3d at 1363.

Marshall contends that he engaged in statutorily protected behavior when (1) he complained about the BOA Error final written warning in April 2007, (2) he complained in the summer of 2007 regarding his temporary supervisor's management style, (3) he complained in the summer or fall of 2007 about being pressured to lie about the reasons for Hooper's termination, and (4) he complained during his discharge meeting on

February 21, 2008 that he was being treated unfairly because white employees were permitted to transfer to other jobs within TSYS while he was not.

Even assuming that each of these complaints constitutes protected activity, Marshall has not pointed to any evidence to establish a causal connection between these complaints and his termination, which occurred on February 21, 2008. Causation can be established "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas*, 506 F.3d at 1364. "But mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Breeden*, 532 U.S. at 273). "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.* "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Id.*

Here, with regard to Marshall's first three proffered instances of protected activity, there was a disparity of at least three months between the protected activity and the adverse employment action, and there is no other evidence tending to show causation. With regard to the fourth proffered instance of protected activity, Marshall did not make the

complaint until *after* TSYS made the decision to fire him, so that complaint did not *cause* TSYS to fire Marshall. For these reasons, the Court cannot find that Marshall has made out a prima facie case of retaliation, and TSYS is therefore entitled to summary judgment on Marshall's retaliatory discharge claims.

> G.  Intentional Infliction of Emotional Distress

"The elements of a cause of action for intentional infliction of emotional distress are: (1) intentional or reckless conduct; (2) that is extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress." *Ferrell*, 295 Ga. App. at 333, 672 S.E.2d at 13. "Extreme and outrageous conduct is that which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Abdul-Malik*, 297 Ga. App. at 856, 678 S.E.2d at 559. Here, the evidence does not establish extreme and outrageous conduct. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993) (applying Georgia law) (finding that although a reasonable factfinder could conclude that the plaintiff was terminated because of his age, in violation of federal law, the termination—standing alone—could not support a claim of intentional infliction of emotional distress).

Therefore, TSYS is entitled to summary judgment on Marshall's intentional infliction of emotional distress claim.

CONCLUSION

For the reasons explained in this order, TSYS's Motion to Strike (ECF No. 88) is granted and TSYS's Motion for Summary Judgment (ECF No. 54) is granted in part and denied in part. Specifically, the Court denies summary judgment as to Hooper's Equal Pay Act and Title VII wage discrimination claims but grants summary judgment as to all of Hooper's other claims. The Court denies summary judgment as to Marshall's discriminatory discharge claim but grants summary judgment as to all of Marshall's other claims.


IT IS SO ORDERED, this 30th day of June, 2011.

S/Clay D. Land
_____
CLAY D. LAND
UNITED STATES DISTRICT JUDGE